91 F.3d 139
 NOTICE: Fifth Circuit Local Rule 47.5.3 states that unpublished opinions should normally be cited only when they establish the law of the case, are relied upon as a basis for res judicata or collateral estoppel, or involve related facts. If an unpublished opinion is cited, a copy shall be attached to each copy of the brief.
Roger K. PARSONS, individually and as Administrator of the
Estate of Esther Ann Parsons, Deceased, Vasilios
Kartsotis and Sofia Kartsotis,
Plaintiffs-Appellants, Cross-Appellees,
v.
E.I. DU PONT DE NEMOURS AND COMPANY, Defendant-Appellee,
Cross-Appellant.
 No. 94-20756.
 United States Court of Appeals, Fifth Circuit.
 June 12, 1996.
 
 Before BARKSDALE, DeMOSS, and PARKER, Circuit Judges.
 PER CURIAM:*
 
 
 1
 Primarily at issue is whether, under controlling Texas law, the standard for finding gross negligence, as fairly recently defined in Transportation Ins. Co. v. Moriel, 879 S.W.2d 10 (Tex.1994), was satisfied in this diversity action against E.I. Du Pont De Nemours and Company, arising out of the crash of its airplane, in which Roger K. Parsons' wife was killed. He challenges the post-verdict judgment as a matter of law granted Du Pont on that issue; Du Pont urges that the district court reversibly erred by even submitting that issue to the jury and by commenting on the rule of admissibility for subsequent remedial measures, FED.R.EVID. 407. We AFFIRM.
 
 I.
 
 2
 In September 1991, Ann Parsons and other Conoco employees travelled on a Gulfstream II jet to the Far East. Conoco is a wholly owned subsidiary of Du Pont, which owned the jet and employed the two pilots. When they attempted a scheduled refueling stop at Kota Kinabalu, Malaysia, the plane hit a mountain near the airfield, killing all on board.
 
 
 3
 Upon the husband and parents of Ann Parsons filing this action in Texas state court, Du Pont removed it to federal court. (Although the husband and parents appealed the judgment on gross negligence, the parents' appeal was dismissed.)
 
 
 4
 Pursuant to Texas law, the district court ordered a bifurcated trial in which the issues of negligence, gross negligence, and actual damages would be considered in the first phase. During Parsons' case-in-chief, the trial judge commented that, "if the evidence [did] not get a whole lot stronger, [Parsons was] not going to get to the jury on [the gross negligence] issue". The court chose, however, at the close of Parsons' case-in-chief, to take under advisement Du Pont's motion for judgment as a matter of law on that issue and to hear the defense witnesses, reasoning that they might "admit something that constitute[d] gross negligence", and noting that, if they did not, he would hear the motion at the charge conference. Before charging the jury, however, the court declined again to rule on the motion and instead took it under advisement, preferring to "hear what the jury thinks about [the gross negligence issue]". See FED.R.CIV.P. 50 advisory committee notes, 1991 Amendment Subdivision (a) (noting reasons that court may wisely decline to rule on motion for judgment as matter of law made at close of evidence until after verdict has been rendered).
 
 
 5
 In addition to finding Du Pont negligent and awarding actual damages, the jury found gross negligence; but, immediately after the jury returned its verdict, Du Pont was granted judgment as a matter of law on that issue. The judge made the following comments in granting the motion:
 
 
 6
 Obviously we've known that motion was coming since we had a motion not to submit that [gross negligence] question to the jury, in the first place. I don't think we need to argue it much further. I have given that a great deal of thought through the trial, and while I was submitting the charge to the jury, I do not believe that there is any evidence in this case which warrants a finding of gross negligence as that is defined in the law of the State of Texas.
 
 II.
 
 7
 Moriel controls the gross negligence issue presented by the appeal, and is a factor in the two cross-appeal issues. It was handed down shortly before trial, and argued to the district court throughout.
 
 A.
 
 8
 Post-verdict judgments as a matter of law are reviewed de novo under the well-known standard found in FED.R.CIV.P. 50. This standard is nicely described in Robertson v. Bell Helicopter Textron, Inc., 32 F.3d 948 (5th Cir.1994) (citations omitted), cert. denied, --- U.S. ----, 115 S.Ct. 1110 (1995):
 
 
 9
 In reviewing the district court's decision to grant a judgment as a matter of law, we use the same standard of review that guided the district court. We consider all the evidence with all reasonable inferences in the light most favorable to the party opposed to the motion. If the facts and the inferences point so strongly and overwhelmingly in favor of [the movant] that reasonable jurors could not arrive at a contrary verdict, then the motion was properly granted. If there is substantial evidence--that is, evidence of such quality and weight that reasonable and fair-minded jurors might reach a different conclusion--then the motion should have been denied.
 
 
 10
 Id. at 950-51.
 
 
 11
 The parties agree on the controlling Texas law standard for gross negligence, referenced by the trial judge and stated in Moriel, 879 S.W.2d at 23:
 
 
 12
 [T]he definition of gross negligence includes two elements: (1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of [the] potential harm to others, and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.
 
 
 13
 In light of this standard, including that "the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the ... safety ... of others", it is understandable that, on appeal, Parsons does not charge the pilots with gross negligence. Instead, he asserts that reasonable jurors could have found that Du Pont was grossly negligent in that (1) its "aviation manager knew that the pilots were substandard and needed training, yet failed to act before the deadly flight or provide alternative commercial transportation to carry out the business objectives for this trip", and (2) it "failed to adopt the procedures or furnish the equipment necessary to insure safe passage in a non-radar, third world airport or choose airfields that could provide radar service". Du Pont counters that, contrary to the Moriel standard, Parsons did not provide evidence (1) that, "viewed objectively from the standpoint" of Du Pont, its training procedures or flight operations involved an extreme degree of risk of harm to others, or (2) that it had "actual, subjective awareness" that its training procedures or flight operations posed such risk, yet "proceed[ed] in conscious indifference to the ... safety ... of others".
 
 
 14
 As indicated, Parsons relies on three separate categories of evidence: (1) Du Pont's training and regulation of its pilots, (2) the selection of the Kota Kinabalu airport, and (3) the equipment on board the aircraft. He urges that these factors separately or in combination provide a basis for gross negligence. As discussed below, and based on our de novo review, we conclude that these factors, either separately or combined, fail to satisfy the Moriel standard.
 
 1.
 
 15
 In contending that Du Pont was aware of a grave risk inherent in its training of pilots and yet failed to rectify this problem, Parsons relies primarily on the testimony of Du Pont's director of aviation. He did testify that he had identified changes he intended to implement in order to improve the quality of his department; but, he never testified that the changes were necessary to avoid a safety risk.
 
 
 16
 One of the changes envisioned by the aviation director, General Peterson, was the elimination of "professional co-pilots". He never stated, nor could a juror have reasonably found, that the change was necessary to remedy a safety threat. For example, he never testified that the co-pilot on the subject flight, who was in that category, was slated to be dismissed for being a substandard pilot. Moreover, notwithstanding Parsons' assertion to the contrary, no reasonable juror could have inferred, based on the testimony that General Peterson preferred to eliminate the use of professional co-pilots, that Du Pont consciously disregarded an extreme risk to safety caused by the continued use of such pilots.
 
 
 17
 General Peterson testified also that he intended to implement changes to provide more training in the areas of cockpit management, situational awareness, and international flights. He did not testify, however, that these changes were necessary to correct a safety problem, or that the pilots who flew this aircraft were inadequately trained. His testimony in no way gave rise to a finding that Du Pont had acted in disregard of a conscious belief that any risk existed.
 
 
 18
 For the contention that Du Pont was grossly negligent in its training or regulation of pilots, Parsons relies as well on the testimony of one of its experts, Bill Frederick, in order to satisfy Moriel. Frederick opined that Du Pont negligently managed and negligently communicated with its pilots, but did not express an opinion on gross negligence, either expressly or by stating that Du Pont had subjective awareness of any extreme risk. Frederick was asked whether he could have predicted that the deficiencies in Du Pont's management of its pilots would result in a crash. His affirmative answer was insufficient to support a jury finding of gross negligence under Moriel's second prong, because it did not provide a basis for the jury to conclude that Du Pont ever came to any such realization (the requisite "actual, subjective awareness").
 
 
 19
 Likewise, Parsons' expert Leslie McNease failed to provide testimony sufficient under Moriel to establish gross negligence. He opined that the pilots lacked the necessary assertive demeanor to demand an appropriate instruction from the Malaysian air traffic controllers; that Du Pont's base manager could have determined this by reviewing the pilots' training records; and that, had that manager reviewed those records, he could have determined that the pilot in charge was incapable as an international pilot. But, missing is any evidence that would support finding Du Pont was actually aware of any pilot inadequacy that posed a threat to safety.
 
 
 20
 In short, among other deficiencies, the evidence on pilot training and management does not satisfy the requirements of Moriel's "actual, subjective awareness" prong.
 
 2.
 
 21
 The assertion that the selection of Kota Kinabalu for refueling evidenced gross negligence rests largely on its lacking radar. However, the uncontroverted testimony of Jesse McNown, Du Pont's chief pilot of Conoco flight operations, was that hundreds of airports in the United States are not equipped with radar and that flight into such airports is common. No evidence supported finding that selection of this airport posed the type of extreme risk required by Moriel.
 
 3.
 
 22
 Finally, Du Pont's failure to equip the aircraft with a Ground Proximity Warning System (GPWS) is said to constitute gross negligence. Along this line, Parsons contends that the charts supplied to the crew were insufficient and also provide a basis for the jury to have found gross negligence.
 
 
 23
 As noted, Moriel's second prong required Parsons to produce evidence that Du Pont believed that failure to equip its plane with GPWS posed an extreme risk to the safety of those aboard the aircraft, but that it proceeded with conscious indifference to that risk when it chose not to so equip its plane. The undisputed evidence was that Du Pont believed the system for this model was unreliable. Likewise, we find nothing in the record to support an inference that it felt that failure to equip the plane with GPWS constituted an extreme risk.
 
 
 24
 As to the charts, while Parsons asserts that the pilots lacked terrain maps, they were supplied other maps which included information about the terrain. The evidence regarding the charts did not support an inference that Du Pont was aware of any extreme risk presented by failure to supply the pilots with any other type chart.
 
 
 25
 In sum, for the gross negligence claim, no reasonable juror could have concluded, inter alia, that Du Pont had an actual, subjective awareness of an extreme risk and yet acted in disregard of that risk, as required by Moriel.
 
 B.
 
 26
 At issue in Du Pont's cross-appeal are whether the district court committed reversible error by submitting the question of gross negligence to the jury, and by explaining to the jury the rule against admission of evidence of subsequent remedial measures.
 
 1.
 
 27
 Prior to the jury being charged, in reurging Du Pont's motion for judgment on the gross negligence claim, its counsel asserted that there was no evidence to support the claim, and that, "[a]lthough ... it's often the case that the court is inclined to allow the jury to consider [the claim], ... it would be prejudicial in this case". And, immediately after granting the requested judgment for Du Pont upon the verdict being returned, the trial judge, after stating there was "no evidence of gross negligence", stated that he did not "see ... any indication that [the jurors] let their feelings of gross negligence affect the amount" of the verdict.
 
 
 28
 Du Pont is not entitled to relief for the erroneous submission of an issue to the jury if we are "reasonably certain that the jury was not influenced" by that submission. Woods v. Sammisa Co, Ltd., 873 F.2d 842, 849 (5th Cir1989), cert. denied, 493 U.S. 1050 (1990). As did the trial judge, we have that certainty.
 
 
 29
 We find no merit in Du Pont's assertions that either the amount of compensatory damages awarded or the note jurors sent to the judge during their deliberations demonstrates that the jury's consideration of gross negligence significantly influenced its findings on the other issues. Among other things, in response to the jury's note, the district court instructed it to "not let any finding on 'gross' negligence affect [its] 'damages' answer". "[J]uries are presumed to follow their instructions." Zafiro v. United States, 506 U.S. 534, 113 S.Ct. 933, 939 (1993). We find nothing to indicate otherwise here.
 
 2.
 
 30
 Du Pont failed to object to the court's explanation of the rule on subsequent remedial measures; needless to say, we therefore review only for plain error. Highlands Ins. v. National Union Fire Ins., 27 F.3d 1027, 1032 (5th Cir.1994) (applying plain error standard to issues raised for first time on appeal in civil case), cert. denied, --- U.S. ----, 115 S.Ct. 903 (1995).
 
 
 31
 Even assuming under the several step plain error standard that the Rule 407 discussion was "error" that was "plain" and that "affect[ed] [Du Pont's] substantial rights" by alerting the jury to the existence of subsequent remedial measures, id., we exercise our discretion to correct forfeited errors only when the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id.; see, e.g., United States v. Calverly, 37 F.3d 160, 164 (5th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1266 (1995). That exception would not apply in this case.
 
 III.
 For the foregoing reasons, the judgment is
 
 32
 AFFIRMED.
 
 
 
 *
 Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4